FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

2015 AUG -3 P 3: 38

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| COESTERVMS.COM, INC.,<br>7529 Standish Place<br>Suite 200<br>Rockville, MD 20855<br><br>        Plaintiff,<br><br>    v.<br><br>VIRGINIA REAL ESTATE APPRAISER<br>BOARD,<br>Perimeter Center, Suite 400<br>9960 Mayland Drive<br>Richmond, VA 23233, and<br><br>H. GLENN JAMES, in his official capacity<br>as a member of the Virginia Real Estate<br>Appraiser Board,<br>Perimeter Center, Suite 400<br>9960 Mayland Drive<br>Richmond, VA 23233, and<br><br>MICHAEL G. MILLER, in his official<br>capacity as a member of the Virginia<br>Real Estate Appraiser Board,<br>Perimeter Center, Suite 400<br>9960 Mayland Drive<br>Richmond, VA 23233, and<br><br>CHRISTOPHER S. CALL, in his official<br>capacity as a member of the Virginia<br>Real Estate Appraiser Board,<br>Perimeter Center, Suite 400<br>9960 Mayland Drive<br>Richmond, VA 23233, and<br><br>RENE FONSECA, in his official<br>capacity as a member of the Virginia<br>Real Estate Appraiser Board,<br>Perimeter Center, Suite 400<br>9960 Mayland Drive | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:15-CV-_980_
_TSE/JFA_

Jury Trial Demanded

Richmond, VA 23233, and                              )
                                                     )
JEAN M. GANNON, in her official                      )
capacity as a member of the Virginia                 )
Real Estate Appraiser Board,                         )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
SCOTT MAYAUSKY, in his official                      )
capacity as a member of the Virginia                 )
Real Estate Appraiser Board,                         )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
ROBERT O. ROCHESTER, in his official                 )
capacity as a member of the Virginia                 )
Real Estate Appraiser Board,                         )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
LAURA SANCHEZ DEL SOLAR,                             )
in her official capacity as a member                 )
of the Virginia Real Estate Appraiser Board, )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
FAY B. SILVERMAN, in her official                    )
capacity as a member of the Virginia                 )
Real Estate Appraiser Board,                         )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
THOMAS STRICKLAND, JR.,                              )
in his official capacity as a member                 )
of the Virginia Real Estate Appraiser Board, )
Perimeter Center, Suite 400                          )
9960 Mayland Drive                                   )
Richmond, VA 23233, and                              )
                                                     )
                    Defendants.                      )
_____)

## COMPLAINT

This is an action for violations of the federal antitrust laws, which prohibit conspiracies to restrain or monopolize trade.  15 U.S.C §§ 1, 2, 15 and 26.  The Virginia Real Estate Appraiser Board and its members, both current and former, have conspired and agreed to restrict trade and commerce in the real estate appraiser market in the Commonwealth of Virginia.  Their actions to restrain trade include arbitrarily and inappropriately recommending denial of CoesterVMS.com, Inc.'s ("CVMS") license, thereby abusing the Board's monopoly power within the market and removing from the market one of the largest market participants.  In doing so, the Board members, most of whom are active participants in the real estate appraiser market, are attempting to artificially fix high prices for their own benefit.  The concerted actions taken by the Board and its members constitutes anticompetitive conduct in violation of the Sherman Act.  CVMS requests preliminary and permanent injunctive relief to bar the Board and its members from further harming CVMS and the real estate appraisal market within the Commonwealth of Virginia.

## PARTIES

1.      Plaintiff CoesterVMS.com, Inc. ("CVMS") is a company incorporated under the laws of the State of Maryland, with its principal place of business at 7529 Standish Place, Suite 200, Rockville, MD.

2.      CVMS is an appraisal management company ("AMC") that works with finance companies and real estate appraisers in all fifty states.

3.      CVMS has received accolades from a variety of industry publications with respect to its innovative approach to the new regulatory landscape, including:  receiving the 2013 Innovation Award from October Research; being named twice to the Inc. 5000 list of fastest

growing private companies in America; being named one of the fastest growing companies in the DC metropolitan area by Washington Business Journal in 2014; being named to Housing Wire's Tech 100 for the housing economy's most innovative companies; and its CEO, Brian Coester, being named by National Mortgage Professional Magazine as one of the forty most influential mortgage professionals under forty years of age.

4.     Defendant Virginia Real Estate Appraisal Board (the "Board") is an administrative department of the Virginia Department of Professional and Occupational Regulation which regulates, inter alia, the licensing of individual real estate appraisers ("fee appraisers"), fee appraiser business entities, and AMCs.

5.     Pursuant to Va. Code Ann. § 54.1-2012, the Board shall consist of ten members: 6 fee appraisers; 1 officer or employee familiar with mortgage lending of a financial institution; one officer or employee of an appraisal management company; and two citizen members.

6.     Defendant H. Glenn James is the current chair of the Board, and is a fee appraiser. Mr. James is the owner of Commercial First Appraisals, LLC, a fee appraiser business entity that competes directly with CVMS.  Mr. James resides in Norfolk, VA.

7.     Defendant Michael G. Miller is the Vice Chair of the Board, and is a fee appraiser.  Mr. Miller is CEO of MGMiller Valuations, Inc., a fee appraiser business entity that competes directly with CVMS.  Mr. Miller resides in Richmond, VA.

8.     Defendant Christopher S. Call is a member of the Board, and is a fee appraiser. Mr. Call is CEO of AREAS Appraisers, Inc., a fee appraiser business entity that competes directly with CVMS.  Mr. Call resides in Springfield, VA, and AREAS Appraisers, Inc., maintains its principal place of business in Springfield, VA.

4

9.     Defendant Rene Fonseca is a member of the Board, and is a citizen member.  Mr. Fonseca is not a fee appraiser, and resides in McLean, Virginia.

10.     Defendant Jean M. Gannon is a member of the Board, and is a fee appraiser.  Ms. Gannon runs a fee appraiser business entity called Gannon and Associates that competes directly with CVMS.  Ms. Gannon resides in Powhatan, VA.

11.     Defendant Scott Mayausky is a member of the Board, and is a fee appraiser.  Mr. Mayausky resides in Stafford, VA.

12.     Defendant Robert O. Rochester is a member of the Board and is a fee appraiser.  Mr. Rochester is the chief appraiser for Union First Market Bank in Richmond, VA.  Mr. Rochester resides in Richmond, VA.

13.     Defendant Laura Sanchez del Solar is a member of the Board, and is a citizen member.  Ms. Sanchez del Solar is not a fee appraiser, and resides in Henrico, VA.

14.     Defendant Fay B. Silverman is a member of the Board.  Ms. Silverman is not a fee appraiser, and works as the Compliance Comptroller for Tidewater Mortgage Services, Inc., in Virginia Beach, VA.  Ms. Silverman resides in Virginia Beach, VA.

15.     Defendant Thomas Strickland, Jr. is a member of the Board and is a fee appraiser.  Mr. Strickland is the President of Strickland Appraisals, Inc., a fee appraiser business entity that competes directly with CVMS.  Mr. Strickland resides in Chester, VA.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17.     This Court has personal jurisdiction over the Board and each individual Defendant because the Board is situated within the Eastern District of Virginia.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in Virginia, all defendants reside in Virginia and the majority of the defendants reside in this District, and three of the defendants reside within the Alexandria Division.

## FACTUAL ALLEGATIONS

### Background

19.     In the wake of the housing meltdown and ensuing financial crisis, residential real estate appraisal reform was among one of the many changes implemented throughout the finance industry.

20.     In 2009, the Home Valuation Code of Conduct ("HVCC") was created as a result of investigations by the New York State Attorney General's Office into home valuations that were alleged to be artificially high.

21.     The HVCC established certain requirements regarding independence of fee appraisers.  According to the Federal Housing Finance Agency, "The HVCC is designed to promote professional appraisals free from inappropriate pressure from lenders, borrowers or brokers."

22.     Although the HVCC was not created by a federal regulation or statute, its standards were adopted by the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Corporation ("Freddie Mac"), whose market power combined dictated adoption of the HVCC standards across the nation.

23.     In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which amended the federal Truth in Lending Act ("TILA") and Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), requiring the

Federal Reserve Board to implement new interim federal regulations regarding appraiser independence. These rules were effective on December 27, 2010, and replaced the HVCC.

24.     Dodd-Frank also required the newly formed Consumer Financial Protection Bureau to issue final appraisal requirements, which were implemented and effective as of January 18, 2014.

25.     As part of both the HVCC and the new Appraisal Independence Rules under TILA, fee appraisers are not allowed to have direct contact with loan company origination and production staff.

26.     As a result of these new rules, many lenders began using Appraisal Management Companies ("AMCs") to provide a layer of independence to the appraisal ordering process.

27.     By acting as an intermediary, AMCs eliminate direct communications between lenders and appraisers, thereby ensuring lenders have no undue influence over appraisers and thus mitigating the risk of federal law violations.

28.     AMCs also offer services that lenders would otherwise be required to bear the cost of: they track appraiser licenses, qualifications and assignments, maintain rosters of licensed appraisers with whom they work, and assign appraisal requests received from lender clients out to appropriate members on their rosters.

29.     As a result, many lenders exclusively deal with AMCs, and do not directly communicate with or contract with individual appraisers or non-AMC appraiser business entities.

30.     Dodd-Frank also requires states to establish licensing criteria for AMCs that meets minimum standards set forth in Dodd-Frank and in regulations jointly promulgated by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau,

the National Credit Union Administration, and the Federal Housing Finance Agency, within 36

months of the effective date of the final rule.  The final rule was published in the Federal

Register on June 9, 2015, and its effective date is August 10, 2015.

31.     Prior to Dodd-Frank, the Commonwealth of Virginia did not require AMCs to

be licensed to do business in the Commonwealth.

32.     However, in accordance with Dodd-Frank, the Commonwealth established new

licensing requirements for AMCs that became effective on February 1, 2015.  The Board stated

administratively, without prior notice or rulemaking, that if an AMC applicant applied for a

license by Feb. 1, 2015, even if the AMC did not have a license by that time, they would be

grandfathered.  CVMS filed its application for a license on January 27, 2015.  As early as

February 3, 2015, the Board was threatening to deny CVMS's license.

33.     On May 19, 2015, the Board announced without prior notice or rulemaking that

AMC applicants had to complete such licensing by August 18, 2015 or cease doing business in

the Commonwealth.  The Board controls the licensing decisions in the Commonwealth through

its sole discretion.

### The Relevant Market

34.     The relevant market to evaluate the conduct of the Board is the provision of

single-family residential real estate appraisals in the Commonwealth of Virginia.

35.     CVMS began operations in 2009, and has grown steadily since.  CVMS currently

operates and is in good standing in all 50 states.

36.     From 2013 until the present, CVMS's business in Virginia has accounted for

10.10% of its total nationwide business.

37.     Between January 1, 2013, and July 30, 2015, CVMS completed 10,113 appraisal assignments in Virginia.

38.     Upon information and belief, CVMS is one of the largest market participants in the Commonwealth of Virginia.

39.     Because of the implementation of new federal appraisal independence rules, AMCs have become more prevalent in the appraisal industry and have gained a larger foothold in the marketplace, competing directly against independent fee appraiser business entities.

40.     Because of the increased competition, prices became more competitive in the appraisal industry as a whole.

41.     The Board has and exercises the power to exclude fee appraisers, fee appraiser business entities, and AMCs from competing in the relevant market.

### The Board's Anticompetitive Structure

42.     The Board is required by statute to be comprised of ten individuals:  6 fee appraisers; 2 citizen members; 1 financial institution representative; and 1 AMC representative.

43.     As currently configured, the Board represents that the 6 fee appraiser members are the following defendants:  Defendant James, Defendant Miller, Defendant Gannon, Defendant Mayausky, Defendant Rochester, and Defendant Strickland.

44.     As currently configured, the Board represents that the AMC representative is Defendant Call.

45.     But Defendant Call's company, AREAS Appraisers, Inc., is not an AMC—it is a fee appraiser business entity.

46.     AREAS Appraisers, Inc. does not possess an AMC license.

47. Further, Defendant Call is a founding member and former executive officer of the Virginia Coalition of Appraiser Professionals, an organization that actively campaigns against AMCs.

48. Because Call is not actually an AMC employee, executive, or officer, there are no AMC representatives on the Board as currently configured.

49. Instead, there are seven fee appraiser representatives on the Board.

50. Because the fee appraiser representatives represent a super-majority of the Board, all decisions made by the Board are dictated by fee appraiser interests.

51. All Board members are either active market participants or citizens.

52. None of the Board members sits on the Board as a government employee.

53. No employee or officer of the Commonwealth of Virginia possesses authority to supervise the actions or decisions of the Board.

54. Final decision-making authority on all AMC licensure issues lies with the Board.

55. No employee or officer of the Commonwealth of Virginia possesses authority to veto or modify particular decisions of the Board to ensure they accord with state policy.

56. Individual fee appraisers generally dislike AMCs, believing, among other complaints, that AMCs drive prices down for individual fee appraisers. *See, e.g.,* Exhibit A (Article from Virginia Realtor magazine discussing fee appraiser sentiments towards the rise of AMCs, citing two current members of the Board and one former member of the Board).

57. The Virginia Coalition of Appraiser Professionals, a trade association for independent fee appraisers, has conducted an active campaign against AMCs, including publishing a letter titled "AMC Dangers: Appraisal Management Companies are Changing How Our Profession Works," on its website. *See* Exhibit B (copy of the AMC Dangers letter).

58.    Similar to the Virginia Realtor article cited in paragraph 56, most of the complaints stated in the AMC Dangers letter pertain to lower fees paid to the independent fee appraisers as a result of increased competition from AMCs.

59.    Similarly, in response to a request for public comments by federal regulators regarding proposed new federal appraisal rules, the Virginia Coalition of Appraiser Professionals, along with twelve other similar state trade associations, submitted comments to the federal regulators. Among other statements, this letter stated: "The professional appraiser's business, as well as the appraisal profession, have been decimated by the increasing market dominance of AMCs. Trust and credibility have been significantly damaged, highly qualified appraisers have left the business, and the financial viability of the traditional appraiser business model has been destroyed."

60.    Woody Fincham, a fee appraiser and former executive board member of the Virginia Coalition of Appraiser Professionals, drafted an article on January 12, 2013 titled "Virginia is for Lovers:  All but AMCs." In this article, Mr. Fincham explicitly stated negative comments about CVMS, making allegations about CVMS's CEO and publishing unsubstantiated complaints about CVMS. Mr. Fincham's article expressed concern about the downward pricing pressure being created by AMC competition, explicitly by CVMS.

61.    At least two Board member Defendants have also been executive officers of the Virginia Coalition of Appraiser Professionals within the past year.

62.    Defendants Call and Strickland were listed as executive officers of the Virginia Coalition of Appraiser Professionals as of October 22, 2014.

63.    Defendant Strickland was listed as an executive officer of the Virginia Coalition of Appraiser Professionals as of April 9, 2015.

64.     At the time of this Complaint, the President of the Virginia Coalition of Appraiser Professionals is P.E. "Pat" Turner, a former member of the Board.

65.     Further, Alex Uminski, an employee of Defendant Miller, currently serves as the Treasurer of the Virginia Coalition of Appraiser Professionals.

66.     Gil Rogers, an employee of Defendant Call, currently serves as an executive officer of the Virginia Coalition of Appraiser Professionals.

67.     The Appraisal Institute, a global professional association of fee appraisers, testified before Congress in 2011 regarding "the low fees many AMCs pay appraisers," causing customers to "rely on valuation services from some of the least qualified and least competent appraisers hired by some AMCs." Defendants Miller and Gannon are, or have been in the past, actively associated with the Appraisal Institute.

68.     Because the Board is controlled by active market participants who are direct competitors of CVMS, and who possess strong self-interest, the Board's structure poses inherent risk of self-dealing and anti-competitive conduct.

69.     Because of the Board's anti-competitive structure dominated by market participants, the Board does not possess state action immunity under the federal antitrust laws. *See North Carolina State Board of Dental Examiners v. Federal Trade Comm'n*, 135 S. Ct. 1101 (2015).

**The Board's Anticompetitive Conduct**

70.     On numerous occasions the Board, and certain defendant Board members communicated, conspired, and agreed to restrict CVMS from competing in the marketplace:

> a.  On May 29, 2015, Mr. Turner forwarded to Defendants Strickland, James, Call, and Gannon an email he received from Scott Dibiaso of the Appraisal

Institute, informing Mr. Turner that CVMS had "signed a Consent Agreement in Louisiana last night." Mr. Turner's email to Defendant Board members stated: "It is my belief that this has HUGE consequences across the country. **Do not forward this but you can ask questions.**" (emphasis added).

b.  The Louisiana Settlement Agreement referenced in paragraph 70(a) was not executed and issued until June 4, 2015. The Louisiana Settlement Agreement was not publicly available until its issuance.

c.  On May 1, 2015, Mr. Turner sent an email to Defendant Call, Defendant Strickland, Defendant Gannon, and Defendant James, relaying information about a session he would be attending at an industry conference in Nashville. About the presentation on AMCs, he stated: "I hope it will be what we want to hear." Later that same day, Defendant James emailed Mr. Turner in response separately, stating: "Fingers crossed for good news from the Feds on AMCs."

d.  Fee appraiser members of the Board have communicated with each other and Mr. Turner regarding developments in AMC regulation, with a particular emphasis on Mr. Turner's continuing campaign against AMCs, and the Virginia Coalition of Appraiser Professionals' campaign against AMCs.

e.  On June 6, 2015, Mr. Turner sent an email to Mr. Coester regarding incorrect news reports stating CVMS had been penalized by the Louisiana Real Estate Appraiser Board. The email's subject line was: "Louisiana." The text of the email included what appears to be a threat: "I'm going to get you now you piece of [expletive deleted]."

f.  On or about February 9, 2015, Mr. Turner posted vulgar comments on a Facebook picture of Mr. Coester and a female friend attending a formal party. Mr. Turner's comment stated only the following: "Kiss my [expletive deleted]."

g.  Defendant James on multiple occasions communicated with Mr. Turner regarding AMC competition, including Mr. Turner sending Mr. James multiple negative comments regarding CVMS.

h.  On June 23, 2015, Mr. Turner forwarded to Defendant James a copy of a Consent Order entered into between CVMS and the State of Minnesota.

i.  Defendant Strickland, Defendant James, Defendant Gannon, Defendant Miller, and Defendant Call have communicated on multiple occasions with Mr. Turner regarding AMC licensing issues, including multiple negative comments regarding CVMS.

j.  On May 7, 2015, Defendant James, Defendant Strickland, Defendant Gannon, Defendant Call, and Defendant Miller were the recipients of an email message from Mark White, who as of April 9, 2015, was listed as the President of the Virginia Coalition of Appraiser Professionals. The email stated: "Further evidence that Mercury Network should be required to be licensed under VA's new AMC law."

71.   Defendant Gannon, in response to an email raising concerns about the potential anti-competitive effects of the composition of some states' real estate appraiser boards, stated the following:

> "My first observation is that Steve Turner needs a better grasp on grammar and spelling – or he needs to be sober when corresponding. *My second point*

*would be that we serve on the Real Estate Appraisal Board, not the AMC board.* Our primary objective on the REAB is to ensure the licensed members of our profession are USPAP compliant and live up to the oath taken at licensing." (Emphasis added).

72.     On May 12, 2015, Mr. Turner emailed Defendant Gannon and Alex Uminski, and employee of Defendant Miller, regarding the definition of "Responsible person" under Virginia's regulations.  Mr. Turner emphasized to Defendant Gannon that "What is important is the responsible person is responsible that the AMC 'ensures' compliance with all laws and regs.  A BIG job if complaints start rolling in, just my opinion and my intent when I asked for this to be included."

73.     On June 2, 2015, Mr. Turner and Defendant Gannon exchanged emails with each other about the Board's licensing process, including a line from Mr. Turner regarding "AMCs ruining the profitability of the profession."

74.     Upon information and belief, Defendants actively took steps to plot and conceal their conspiracy.

75.     The price-fixing and conspiring Defendants have also exchanged communications or made statements concerning the price of AMC appraisal services, including but not limited to the following:

       a.  Defendant Strickland communicated with Board staff member Kevin Hoeft, requesting Board staff to perform personal reviews of AMC licensing for him as a result of a business request made to him, and stating that he is "leery when [AMCs] quickly agree to my increased fee. . . . I guess you saw the Coester settlement with Louisiana."

       b.  On July 19, 2014, Defendant James and Mr. Turner emailed each other regarding a statistical analysis of AMCs sent to Mr. Turner and forwarded on

to Defendant James.  Defendant James questioned the fees of AMCs, stating he would "be curious to see the ratio of appraisals handled vs. the number of employees," "how many worker minutes per appraisal does an AMC need vs. the number of hours spent by the typical appraiser," and questioning the "value added that AMCs contribute to the industry."

    c.   The AMC Dangers letter, posted on the Virginia Coalition's website, states that "[t]he incentive for lenders utilizing the services of an AMC [is] cost."

76.     On May 9, 2015, Mr. Turner forwarded to Defendants Strickland, James, Call, and Gannon, as well as Alex Uminski, an employee of Defendant Miller, an email regarding the State of Illinois canceling registration for more than 70 AMCs based on non-compliance with bond requirements.

77.     On the same day, Mr. Turner emailed Defendant James and Board staff member Kevin Hoeft separately with the same email, adding that **"Some of our applicants are on THIS list."** (emphasis added).

78.     Upon information and belief, the conspiring Defendants saw the Illinois cancellations as an opportunity to remove AMC competitors from competing in Virginia's single family residential real estate appraiser market.

79.     The State of Illinois later admitted that this series of cancellations resulted from an internal documentation error on its part, and publicly announced that the information published previously was erroneous.

80.     Upon information and belief, the conspiring Defendants utilized their power and the AMC licensing process as the mechanism to keep lower cost competitor CVMS from entering real estate appraiser market.

### The Board's Sham Licensing Process

81.     The Board required CVMS to participate in an Informal Fact Finding Conference (the "Conference") to determine CVMS's qualifications for licensure as an AMC in Virginia.

82.     Upon information and belief, Defendants agreed to use the Informal Fact Finding Conference as the pre-textual mechanism to prevent CVMS from entering the market.

83.     The Conference was initially scheduled for June 25, 2015, but was rescheduled by the Board twice.

84.     The second time the Conference was rescheduled, Defendant James recused himself from serving as the reviewing officer at the Informal Fact Finding conference. According to Board staff, the reason for his recusal was that he had seen CVMS's CEO speak on cable television and at industry events.

85.     The other Board Defendants, who had exchanged communications plotting against CVMS, did not recuse themselves from the proceedings.

86.     Betsy Critzer, a fee appraiser, direct competitor, and former member of the Board, was substituted for Defendant James as the reviewing officer at the Informal Fact Finding Conference. Ms. Critzer is not currently a member of the Board. There is no formal statute or regulation allowing a non-Board member to conduct Informal Fact Finding Conferences under Virginia law.

87.     On July 15, 2015, CVMS attended its Informal Fact Finding Conference.

88.     CVMS submitted twenty-nine exhibits into the formal record, which included consent orders and settlement agreements entered into in five states: Maryland; North Carolina; Tennessee; Louisiana; and Minnesota. CVMS is currently licensed and in good standing in each

of these five states.  Additionally, in the last quarter, North Carolina and Minnesota have renewed CVMS's license.

89.     Additionally, CVMS submitted into evidence exhibits regarding remedial efforts it had taken in response to the issues raised in the consent orders, and also submitted a new Compliance Management System that CVMS had implemented.

90.     CVMS's compliance management system is comprehensive, and was drafted by expert business consultants at Terra Verde Management Consulting.  These consulting experts have years of experience with major accounting firms, many of them are CPAs, and one has been certified as a regulatory compliance professional by the American Bankers Association.

91.     On July 28, 2015, Ms. Critzer issued a recommendation to the Board recommending denial of CVMS's license.

92.     In her 16 page recommendation, Ms. Critzer ignored record evidence, mischaracterized statements made by CVMS and its counsel in letters to the Board and at the Informal Fact Finding Conference, made inaccurate and erroneous statements of the law, and demonstrated extreme pre-textual bias against CVMS.

93.     For instance, Ms. Critzer stated that a Louisiana settlement agreement was properly considered as disciplinary action against CVMS, **despite a letter submitted into evidence from the Louisiana Real Estate Appraiser Board's staff, responding to the Board's specific request on this issue, stating that the settlement agreement was not disciplinary**.

94.     Ms. Critzer further ignored a letter from the Louisiana Real Estate Appraiser Board's attorney stating that the action was not considered disciplinary.  Instead of relying on direct evidence that the Louisiana action was not disciplinary, Ms. Critzer formed an erroneous

legal conclusion that the action as disciplinary, and mischaracterized the agreement as requiring

penalties and corrective action, despite the clear language of the agreement stating otherwise.

Ms. Critzer purposely ignored the clear record evidence in order to arrive at Defendants' desired

erroneous result.

95.     Ms. Critzer ignored the record evidence that all of the states in which CVMS

entered into consent orders or settlement agreements have approved CVMS's licensure and hold

CVMS in good standing, and that no further actions have occurred in those states.

96.     Ms. Critzer also made unfounded comments regarding the sufficiency of CVMS's

newly-implemented compliance management system. Ms. Critzer conclusorily rested her

recommendation on "some serious oversights in the planned compliance management system,"

yet failed to identify a single such oversight. In fact, CVMS's compliance management system

was drafted by eminently qualified management consultants with years of regulatory audit and

regulatory compliance experience. The compliance management system addresses all

requirements for best practices and expectations set forth by the Consumer Financial Protection

Bureau in its Examination Manual and public comments. Ms. Critzer has no relevant

background or experience in regulatory audit, regulatory compliance, or compliance

management.

97.     Ms. Critzer further penalized CVMS for having a "young CEO."

98.     Ms. Critzer's recommendation is a clear pre-text to denial of CVMS's authority to

operate in the Commonwealth of Virginia, and was designed only to exclude a competitor for the

Defendants' benefit.

### The Harm to CMVS and the Market

99.     Virginia requires all AMCs be licensed to participate in the market.

100.    The Board has exclusive authority to grant, deny, suspend, or revoke AMC licenses in Virginia.

101.    On July 28, 2015, Ms. Critzer recommended the Board deny CVMS the AMC license required to operate in Virginia.

102.    Upon information and belief, the conspiring Defendants have decided to adopt Ms. Critzer's recommendation and deny CVMS a license to operate in Virginia at their meeting on August 18, 2015.

103.    Without the AMC license, CVMS will have to cease operating in Virginia.

104.    By denying CVMS's license, the Board is removing CVMS from the Virginia market.

105.    The denial of CVMS' license is an unreasonable restraint of trade because it prevents a large AMC entity from offering appraisal services to lenders at a competitive lower-cost price point.

106.    CVMS will be harmed immediately upon denial of its license by preventing it from operating in a state which provides ten percent of its annual business. Virginia is CVMS's second largest state by volume of business.

107.    CVMS will permanently lose its customer base in Virginia if the Board's anti-competitive and pre-textual denial of CVMS's license occurs on August 18, 2015.

108.    CVMS is the exclusive provider of appraisal services for multiple clients in the Commonwealth of Virginia, and receives appraisal orders daily. By denying CVMS the authority to operate in Virginia, the Board's actions will thereby affect all of CVMS's clients that operate in Virginia, delaying processing, underwriting, and funding of loans and requiring those clients that use CVMS exclusively to enter into new contracts with different appraisal businesses.

109.    Upon information and belief, CVMS offers lower priced appraisal services to lenders in Virginia than the conspiring Defendants that also participate in the same the market.

110.    By preventing CVMS from entering the market, the Defendant Board members will drive up the price of single family residential appraisals in the Virginia, to the benefit of the competitor fee appraiser Defendants and other fee appraisers in Virginia.

111.    The increased cost of single family residential appraisals will necessarily effect the volume, frequency, and terms of residential sales transactions because these costs will be passed onto homebuyers.

112.    According to a 2014 report issued by Virginia Tech, the average fee for an appraisal ordered directly through non-AMC clients was $401; the average fee for an appraisal ordered through an AMC was $328.  The Virginia Tech survey found that, across all appraisal types, fee appraisers paid directly by non-AMC clients were paid more, on average, than fee appraisers paid by AMC clients.

113.    According to the Virginia Tech survey, the average fee appraiser completed 218 appraisals in 2013.

114.    According to the Virginia Tech survey, fee appraisers earn more from non-AMC appraisals than for AMC appraisals, and fee appraisers expect higher fees across the board than they are paid for both non-AMC and AMC appraisals.  Fee appraisers expect to earn $29 to $41 more than they were actually paid for non-AMC appraisals, depending on the type of appraisal, and $98 to $122 more than they were actually paid for AMC appraisals.  The larger difference for AMC appraisals is due to the lower fees appraisers receive for these appraisals relative to non-AMC appraisals.

115.    The Virginia Coalition of Appraisal Professionals sponsored the creation of the Virginia Tech fee survey.

116.    Like all states, residential sales in Virginia are often transacted by out-of-state buyers.

117.    Real estate appraisals are generally required on all federally-related mortgage loans, as that term is defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, as well as TILA.

118.    By raising the transaction cost of residential sales for purchasers and borrowers on federally-related mortgage loans, Defendants' anti-competitive conduct substantially affects interstate commerce.

### COUNT ONE
### (Agreement in Violation of the Sherman Act, 15 U.S.C. § 1)

119.    Plaintiff incorporates by reference paragraphs 1 through 118 of this Complaint as though fully set forth herein.

120.    The Board and the individual named Defendants agreed to prevent CVMS from entering the market by denying CVMS' application for the AMC license.

121.    Because the Board is comprised of direct competitors operating in the same market as CVMS, their anticompetitive conduct is an unreasonable restraint of trade, which will drive up the cost of residential appraisals and necessarily affect interstate commerce.

122.    Defendants' conduct amounts to price fixing, a *per se* violation of Section One of the Sherman Act. 15 U.S.C. § 1.

## COUNT TWO
### (Conspiracy in Violation of the Sherman Act, 15 U.S.C. § 1)

123.   Plaintiff incorporates by reference paragraphs 1 through 118 of this Complaint as though fully set forth herein.

124.   The Board and the individual named Defendants have conspired to prevent CVMS from participating in the relevant market by pre-textually denying CVMS's license to operate in Virginia.

125.   Because the Board is comprised of direct competitors of CVMS operating in the same market as CVMS, their anticompetitive conduct is an unreasonable restraint of trade, which will drive up the cost of residential appraisals and necessarily affect interstate commerce.

126.   Defendants' conduct amounts to price fixing, a *per se* violation of Section 1 of the Sherman Act.

## COUNT THREE
### (Conspiracy in Violation of the Sherman Act, 15 U.S.C. § 2)

127.   Plaintiff incorporates paragraphs 1 through 118 of this Complaint as if fully set forth herein.

128.   The Board possesses monopoly power in the relevant market by virtue of its regulatory position.

129.   The Board and the Defendant members conspired to abuse that monopoly position by purposefully and pre-textually excluding CVMS, one of the largest actors in the relevant market.

130.    By denying CVMS's license to operate in Virginia, the Board and the Defendant members are removing a direct competitor from the relevant market and creating more business opportunities for their individual businesses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    That the Court declare, adjudge, and decree that Defendants entered into and engaged in a contract, combination, or conspiracy to unreasonably restraint trade, a *per se* violation of Section One of the Sherman Act, 15 U.S.C. § 1.

2.    As authorized by Section 16 of the Clayton Act, 15 U.S.C. § 26, that the Defendants be permanently enjoined and restrained from continuing, maintaining, or renewing the conduct alleged herein, having a purpose to violate federal antitrust laws.

3.    That the Court enter an order enjoining and foreclosing all efforts by Defendants to exclude CVMS from participating in the marketplace by denying CVMS the AMC license on August 18, 2015.

4.    That CVMS recover the costs of this lawsuit, including attorney's fees, and for all other relief this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

Dated: August 3, 2015                    Respectfully submitted,


WEINER BRODSKY KIDER PC


By: _____

Jason W. McElroy (VSB No. 71250)
Michael Y. Kieval (VSB No. 71142)
1300 19th Street, NW, Fifth Floor
Washington, DC 20036-1609
Telephone: (202) 628-2000
Facsimile: (202) 628-2011
Email: mcelroy@thewbkfirm.com
          kieval@thewbkfirm.com

*Attorneys for Plaintiff CoesterVMS.Com, Inc.*